1  PHILLIP A. TALBERT
   United States Attorney
2  SAM STEFANKI
   Assistant United States Attorney
3  501 I Street, Suite 10-100
   Sacramento, CA 95814
4  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
5

6  Attorneys for Plaintiff
   United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,            CASE NO. 2:21-CR-00023-JAM

11                      Plaintiff,       UNITED STATES' OPPOSITION TO
                                         DEFENDANT'S MOTION TO DISMISS
12              v.                       INDICTMENT

13  JUAN ALBERTO MURIA-PALACIOS,

14                      Defendant.

## TABLE OF CONTENTS

I.      FACTUAL AND PROCEDURAL BACKGROUND.....................................................1

II.     STATUTORY BACKGROUND ...................................................................................1

    A.      Congress Enacted Precursors to § 1326 to Deter Repeated Illegal Reentry. ......................2

    B.      Congress Enacted § 1326 to Streamline the Law's Deterrent Effect.................................3

    C.      Congress Amended § 1326 Numerous Times to Increase Its Deterrent Effect. .................4

III.    ARGUMENT ................................................................................................................4

    A.      Section 1326 Is Constitutional Under Rational-Basis Review, Which Applies
        Here............................................................................................................................5

        1.      Muria-Palacios's Challenge Is Subject to Rational-Basis Review. ........................6

        2.      Muria-Palacios's Challenge Fails Under Rational-Basis Review. .........................7

    B.      Muria-Palacios's Reliance on *Arlington Heights* Is Misplaced. .........................................8

        1.      *Arlington Heights* Allows a Searching Inquiry Into Legislative
             Motives Only in Certain Circumstances. ...............................................................8

        2.      The Searching *Arlington Heights* Analysis Does Not Apply to Federal
             Immigration Laws. ...............................................................................................10

        3.      Motives of Legislators From the 1920s Are Irrelevant to the Current
             Statute. ...............................................................................................................10

        4.      Muria-Palacios's Motion Fatally Mischaracterizes Supreme Court
             Precedent. ...........................................................................................................12

        5.      Section 1326 Is Constitutional Because Congress Would Have Enacted
             It Absent Any Supposed Discriminatory Intent......................................................13

    C.      Section 1326's Impact on Certain Defendants Does Not Give Rise to an
        Inference of Discriminatory Intent......................................................................................15

IV.     CONCLUSION...........................................................................................................17

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ............................................................................ 9

*Almendarez-Torres v. United States*, 523 U.S. 224 (1998) ............................................... 4

*Bolling v. Sharpe*, 347 U.S. 497 (1954) ............................................................................ 5

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021) .................................................................... 9, 11

*City & Cty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944
      F.3d 773 (9th Cir. 2019) ....................................................................................... 11

*City of Las Vegas v. Foley*, 747 F.2d 1294 (9th Cir. 1984) ........................................... 10

*City of Mobile v. Bolden*, 446 U.S. 55 (1980) ............................................................ 9, 11

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891
      (2020) ............................................................................................... 9, 11, 15

*E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962 (9th Cir. 2021) ........................ 16

*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ........................... 11

*Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020) .................... 12, 13

*Fiallo v. Bell*, 430 U.S. 787 (1977) ........................................................................ 5, 6, 10

*Hampton v. Wong*, 426 U.S. 88 (1976) .............................................................................. 5

*Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010) ......................................................... 14

*Heller v. Doe*, 509 U.S. 312 (1993) .................................................................................. 6

*Hudson v. United States*, 522 U.S. 93 (1997) .................................................................. 7

*Hunter v. Underwood*, 471 U.S. 222 (1985) ............................................................... 9, 13

*Ledezma-Cosino v. Sessions*, 857 F.3d 1042 (9th Cir. 2017) ........................... 5, 6, 7, 12

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) ..................................................................... 9

*Mathews v. Diaz*, 426 U.S. 67 (1976) ............................................................................... 5

*McCleskey v. Kemp*, 481 U.S. 279 (1987) .................................................................. 9, 11

*Menotti v. City of Seattle*, 409 F.3d 1113 (9th Cir. 2005) ............................................. 10

*Pena-Cabanillas v. United States*, 394 F.2d 785 (9th Cir. 1968) ............................... 3, 6

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979). .................................................. 9

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ................................................................. 12

*Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020). ............................................................. 15

*Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017) ................................................. 5

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) .................................................................... 5, 6

*United States v. Amador-Bonilla*, No. CR-21-187-C, 2021 WL 5349103
    (W.D. Okla. Nov. 16, 2021) ...................................................................................... 8

*United States v. Arenas-Ortiz*, 339 F.3d 1066 (9th Cir. 2003) ................................. 16

*United States v. Ayala-Bello*, 995 F.3d 710 (9th Cir.) ............................................ 6, 7

*United States v. Barajas-Guillen*, 632 F.2d 749 (9th Cir. 1980) ............................. 6

*United States v. Carrillo-Lopez*, No. 3:20-CR-00026-MMD-WGC, 2021
    WL 3667330 (D. Nev. Aug. 18, 2021), ................................................................. 10

*United States v. Corrales-Beltran*, 192 F.3d 1311 (9th Cir. 1999).......................... 2

*United States v. Gallegos-Aparicio*, No. 19-cr-2637, 2020 WL 7318124
    (S.D. Cal. Dec. 11, 2020) ....................................................................................... 14

*United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021
    WL 2138801 (D. Ariz. May 25, 2021) ..................................................................... 8

*United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998). ........ 7, 8, 13, 15

*United States v. Mendoza-Lopez*, 481 U.S. 828 (1987) ........................................... 3

*United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL
    3570229 (D.N.M. Aug. 12, 2021).......................................................................... 8

*United States v. O'Brien*, 391 U.S. 367 (1968) ........................................................ 10

*United States v. Palomar-Santiago*, 141 S. Ct. 1615 (2021) .................................... 4

*United States v. Rivera-Sereno*, No. 2:21-CR-129, 2021 WL 5630728
    (S.D. Ohio Dec. 1, 2021) ......................................................................................... 8

*United States v. Rizo-Rizo*, 16 F.4th 1292 (9th Cir. 2021)................................... 7, 13

*United States v. Ruelas-Arreguin*, 219 F.3d 1056 (9th Cir. 2000)........................... 3

*United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007) ............................. 6, 7

*United States v. Ruiz-Rivera*, No. 3:20-MJ-20306-AHG, 2020 WL
    5230519 (S.D. Cal. Sept. 2, 2020) ......................................................................... 8

*United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL
    5166488 (N.D. Ohio Nov. 5, 2021) ........................................................................ 8

*United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D.V.I.
    June 16, 2021) .......................................................................................................... 8

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977) .................................................................................. 1, 7, 9, 13

*Washington v. Davis*, 426 U.S. 229 (1976) ............................................................... 9

*Wayte v. United States*, 470 U.S. 598 (1985 ............................................................. 5

**FEDERAL STATUTES**

8 U.S.C. § 1326 ............................................................................................................ 1

Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 ....................................... 2

Act of Oct. 16, 1918, Pub. L. No. 65-221 40 Stat. 1012 ........................................... 2

Act of Oct. 3, 1965, Pub. L. No. 89-236, 79 Stat. 911 ............................................. 11

Act of Sept. 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009 .................................... 4

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 ....................... 4

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-
   132, 110 Stat. 1214 ................................................................................................ 4

Immigration Act of 1917, Pub. L. No. 64-301, 39 Stat. 874 ..................................... 2

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ......................... 4, 14

Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952) .......... 3, 7, 11

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No.
   103-322 108 Stat. 1796 .......................................................................................... 4

**OTHER AUTHORITIES**

Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law:
   A New Look at the Immigration and Nationality Act of 1965*, 75 N.C.
   L. Rev. 273, 275 (1996) ....................................................................................... 11

*See* Law Library, Library of Congress, *Criminalization of Illegal Entry
   Around the World* 3 (2019) ................................................................................. 13

U.S. Const. amend. V ................................................................................................... 5

The Court should deny the motion to dismiss filed by defendant Juan Alberto Muria-Palacios (the "defendant" or "Muria-Palacios"). Muria-Palacios's motion relies on the wrong legal standard to analyze the constitutionality of the federal illegal re-entry statute codified at 8 U.S.C. § 1326. And even if his motion applied correct principles of constitutional interpretation, the Court should still deny it because § 1326 is a fully constitutional exercise of Congress's authority to regulate national immigration policy.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

A federal grand jury returned an indictment in 2021 charging Muria-Palacios with being a previously deported alien found in the United States. ECF No. 4. The indictment alleges that Muria-Palacios is an alien who was removed from the United States on or around February 6, 2014, following a conviction for assault with a firearm. ECF No. 4 at 1. The indictment further charges that after he was removed, Muria-Palacios was subsequently found in the United States without authorization on or about September 10, 2020. ECF No. 4 at 1–2.

Muria-Palacios filed a motion to dismiss the indictment on November 29, 2021. ECF No. 33. He argues that § 1326 is unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), asserting that "the original entry and reentry laws were enacted with a discriminatory purpose and still have a disparate impact." ECF No. 33 at 5. Muria-Palacios requested an evidentiary hearing and asked the Court to take judicial notice of a number of documents apparently downloaded from the docket in a criminal case filed in another federal judicial district. ECF No. 33 at 6.

## II.     STATUTORY BACKGROUND

Federal law makes it a crime when any alien who "has been denied admission, excluded, deported, or removed . . . enters, attempts to enter, or is at any time found in, the United States," without appropriate authorization. 8 U.S.C. § 1326(a). The base offense is punishable by a fine and up to two years' imprisonment. *Id.* Higher maximum sentences of up to twenty years apply if, as here, the defendant was removed after being convicted of certain crimes. *Id.* § 1326(b); ECF No. 4 at 4.

///

///

A. **<u>Congress Enacted Precursors to § 1326 to Deter Repeated Illegal Reentry.</u>**

Section 1326 traces its roots to 1917, when Congress enacted the first criminal reentry statute. *See United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999) (characterizing 1917 law as "precursor statute to § 1326"). That provision made it a misdemeanor for a limited class of noncitizens deported for immoral acts to "attempt thereafter to return to or to enter the United States." Immigration Act of 1917, Pub. L. No. 64-301, § 4, 39 Stat. 874, 878–79. The following year, Congress made it a felony punishable by up to five years' imprisonent for those deported for being a member of the anarchistic and similar classes to "return to or enter the United States or attempt to" do so. Act of Oct. 16, 1918, Pub. L. No. 65-221, § 3, 40 Stat. 1012.

In cases not involving these two classes of noncitizens, however, no sanction other than repeatedly deporting illegal reentrants existed until 1929. *See* Immigration Act of 1917 § 19, 39 Stat. at 889. That year, Congress passed "[a]n Act Making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law." Act of March 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551 (the "1929 Act").[1] The opening section of the 1929 Act provided that "any alien . . . arrested and deported in pursuance of law" would "be excluded from admission to the United States" and that, "if he enters or attempts to enter the United States" thereafter, "he shall be guilty of a felony" punishable by a fine and up to two years' imprisonment. *Id.* § 1. The 1929 Act responded to concerns expressed by Congress and the Department of Labor—which at the time administered the country's immigration laws—that the possibility of renewed deportation was insufficient to dissuade those who had been removed from returning, and that criminal penalties were therefore needed as an added deterrent. *See* S. Rep. No. 70-1456, at 1–2 (1929); H.R. Rep. No. 70-2418, at 6 (1929).

///

///

---

[1] The 1929 Act was *not* titled "the Undesirable Aliens Act," as Muria-Palacios claims. ECF No. 33 at 4. A more expansive bill bearing that name was introduced in the House of Representatives. *See* H.R. Rep. No. 70-2418, at 12 (1929). But the Senate rejected several portions of that proposal, including its title. *See* E.P. Hutchinson, *Legislative History of American Immigration Policy, 1798-1965*, at 209–10 (1981). And the House ultimately relented. *See* 70 Cong. Rec. 4,952 (1929) (explaining development of the 1929 Act and "[t]hat the House recede[d] from its amendment to the title of the bill").

**B.**     <u>Congress Enacted § 1326 to Streamline the Law's Deterrent Effect.</u>

Congress revisited the criminal reentry statute twenty-three years later as part of the Immigration and Nationality Act of 1952 (the "INA").  The INA "represents the final product of a most intensive and searching investigation and study over a three year period."  *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968), *abrogated on other grounds by United States v. Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000).  Congress had authorized the Senate Judiciary Committee "to make a full and complete investigation of our entire immigration system" and to provide "recommendations for changes in the immigration and naturalization laws as it may deem advisable."  S. Rep. No. 81-1515, at 803 (1950).  The Judiciary Committee's resulting 925-page report described "difficulties encountered in getting prosecutions and convictions" under existing laws "relating to illegal entry and smuggling of aliens," "especially in the Mexican border area."  *Id.* at 654.  It also noted that existing law criminalized illegal reentry in different provisions subject to different penalties and "suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor."  *Id.* at 655.

Congress responded with section 276 of the INA, codified as 8 U.S.C. § 1326.  In line with the Judiciary Committee's recommendation, the INA eliminated the disparate penalties applicable to reentry defendants depending on the basis for their deportation, creating instead a single offense that subjected all reentry defendants to the same penalties as the 1929 Act:  two years' imprisonment and a fine.  Immigration and Nationality Act, Pub. L. No. 82-414, § 276, 66 Stat. 163, 229 (1952); *see United States v. Mendoza-Lopez*, 481 U.S. 828, 835–36 (1987).  The statute also sought to offset some difficulties in enforcing prior statutes by adding a new basis for liability:  "being 'found in' the United States" after a prior deportation, which is a continuing offense that "commences with the illegal entry, but is not completed until" the defendant is discovered.  *United States v. Ruelas-Arreguin*, 219 F.3d 1056, 1061 (9th Cir. 2000) (quoting 8 U.S.C. § 1326(a)(2)) (citing *United States v. Salazar-Robles*, 207 F.3d 648, 650 (9th Cir. 2000)).

///

///

///

///

**C.**     <u>Congress Amended § 1326 Numerous Times to Increase Its Deterrent Effect.</u>

Section 1326 has been amended on several occasions since 1952, often with an eye toward increasing its deterrent effect.

In 1988, Congress enacted what is now § 1326(b) to prescribe enhanced penalties for defendants with prior felony convictions.  Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7345, 102 Stat. 4181, 4471; *see Almendarez-Torres v. United States*, 523 U.S. 224, 229 (1998).  Two years later, Congress increased the applicable fines for § 1326 violations.  Immigration Act of 1990, Pub. L. No. 101-649, § 543, 104 Stat. 4978, 5059.  In 1994, Congress once again upped the potential carceral penalties for illegally reentering the country following removal to their current level of ten or twenty years.  Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 130001, 108 Stat. 1796, 2023.

In 1996, Congress enacted § 1326(d) in response to the Supreme Court's decision in *Mendoza-Lopez*, *supra*, which held that the statute may violate due process absent an opportunity for the defendant to challenge the validity of a prior removal order.  Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 441, 110 Stat. 1214, 1279; *see United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1619–20 (2021).  Later that year, Congress updated § 1326 once more to add a new penalty provision, to expand the class of prosecutable defendants to include those who departed the United States while an order of exclusion, deportation, or removal was outstanding, and to align the statute with other changes to immigration law enacted in 1996.  Act of Sept. 30, 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-606, 3009-618–3009-620, 3009-629; *see Vartelas v. Holder*, 566 U.S. 257, 261–62 (2012).

### III.     <u>ARGUMENT</u>

The Court should evaluate Muria-Palacios's challenge to the constitutionality of § 1326 using the same rational-basis standard of review applicable to other federal immigration laws.  Because deterring illegal immigration is a legitimate and rational government purpose advanced by § 1326, Muria-Palacios's challenge to that statue fails.  There is no basis for the Court to apply the more searching analysis envisioned by *Arlington Heights*, and even if the Court did so, it should still reject Muria-Palacios's motion because the statute passes constitutional muster.

**A.      Section 1326 Is Constitutional Under Rational-Basis Review, Which Applies Here.**

Muria-Palacios's challenge to Section 1326 arises under the Fifth Amendment.  Unlike the Fourteenth Amendment (which applies to the States), the Fifth Amendment does not contain an express equal-protection provision.  U.S. Const. amend. V.  Since 1954, however, the Supreme Court has construed the Fifth Amendment's due-process guarantee to provide analogous protection.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  And the Supreme Court has generally applied the same equal-protection standards in both contexts.  *See Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985).  Hence, any law drawing, for example, gender-based lines must satisfy heightened scrutiny in order to be constitutional.  *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689–90 (2017) (collecting cases).

Federal immigration laws, however, are an exception to this general rule of constitutional interpretation.  *See Hampton v. Wong*, 426 U.S. 88, 100 (1976).  This is because, "[f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government."  *Mathews v. Diaz*, 426 U.S. 67, 81 (1976).  "Because decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'"  *Trump v. Hawaii*, 138 S. Ct. 2392, 2418–19 (2018) (quoting *Mathews*, 426 U.S. at 81).  Indeed, "[t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization."  *Mathews*, 426 U.S. at 81–82.  This principle applies to congressional enactments that "regulate the admission and exclusion of aliens."  *Fiallo v. Bell*, 430 U.S. 787, 793 n.5 (1977).

In the Ninth Circuit, this narrow standard applicable to the constitutionality of immigration-related statutes equates to rational-basis review.  *See, e.g.*, *Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 (9th Cir. 2017) (en banc) ("[W]e have consistently held . . . that ordinary rational basis review is the appropriate standard in the immigration context.") (citing *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011); *Ablang v. Reno*, 52 F.3d 801, 804 (9th Cir. 1995))).  "Under the rational basis test, a federal policy survives an equal protection challenge if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *United States v. Ayala-*

*Bello*, 995 F.3d 710, 715 (9th Cir.) (quotation marks omitted), *cert. denied*, 2021 WL 5284792 (U.S. Nov. 15, 2021).  That form of review is deferential.  Indeed, the government need not articulate the purpose underlying its policy.  *Id.*  Nor must it "produce evidence to sustain [its] rationality."  *Heller v. Doe*, 509 U.S. 312, 320 (1993).  Rather, "[t]he burden falls on the party" challenging the law "to disprove the rationality" of the classification made.  *United States v. Ruiz-Chairez*, 493 F.3d 1089, 1091 (9th Cir. 2007).  This requires the challenging party to "negate 'every conceivable basis which might support'" such a policy.  *Ayala-Bello*, 995 F.3d at 715.

The Supreme Court and the Ninth Circuit apply this standard—or arguably more deferential ones—to an array of challenges in civil and criminal cases.  *See Hawaii*, 138 S. Ct. at 2419.  The Supreme Court in *Fiallo*, for example, applied minimal scrutiny to a law that drew a gender-based distinction by giving special immigration preferences to mothers, but not fathers, of U.S. citizen children.  430 U.S. at 792–99.  In *Ledezma-Cosino*, the Ninth Circuit reviewed under the rational-basis standard a law that barred "habitual drunkards" from qualifying for cancellation of removal.  857 F.3d at 1048–49.  And in the criminal immigration context, the Ninth Circuit employed that standard in rejecting an equal-protection challenges to provisions of the United States Sentencing Commission Guidelines Manual applicable to "illegal reentrants."  *Ruiz-Chairez*, 493 F.3d at 1091.  And it applied the same standard to a deportation order that formed the basis for a later illegal-reentry prosecution under § 1326.  *United States v. Barajas-Guillen*, 632 F.2d 749, 752–53 (9th Cir. 1980); *see also Ayala-Bello*, 995 F.3d at 714–15 (applying rational basis review to Executive Branch policy treating illegal entry differently from other petty offenses).  These decisions confirm the Supreme Court's recent statement that "a circumscribed [judicial] inquiry applies to any constitutional claim concerning the entry of foreign nationals."  *Hawaii*, 138 S. Ct. at 2420 n.5.

### 1.   Muria-Palacios's Challenge Is Subject to Rational-Basis Review.

Muria-Palacios's constitutional challenge to § 1326 is likewise subject to—and fails under—the rational-basis standard.  That standard applies to his equal-protection challenge because § 1326 is a law that regulates the admission and removal of noncitizens.  *See Fiallo*, 430 U.S. at 792–93 & n.5.

Long ago, the Ninth Circuit described § 1326 as "a regulatory statute enacted to assist in the control of unlawful immigration by aliens."  *Pena-Cabanillas*, 394 F.2d at 788; *see United States v.*

*Rizo-Rizo*, 16 F.4th 1292, 1297 (9th Cir. 2021) (reaffirming this language).  Several aspects of the statute bear out that description.  For instance, § 1326 was enacted as part of the INA in 1952.  Immigration and Nationality Act, Pub. L. No. 82-414, § 276, 66 Stat. 163, 229 (1952).  It is codified in Title 8 alongside other immigration provisions.  Most important, the "text of § 1326 plainly reveals its immigration-regulation purpose."  *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998).  "By threatening with criminal prosecution any alien found in the United States who has previously been 'excluded, deported, or removed,' Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders."  *Id.*  The statute is thus "a necessary piece of the immigration-regulation framework."  *Id.*  And because § 1326 is part of that framework, equal-protection challenges to it are subject to the same standard that applies to other claims in the immigration context:  rational-basis review.  *See Ledezma-Cosino*, 857 F.3d at 1049 & n.4.

A contrary conclusion would lead to a stark anomaly.  Decisions such as *Fiallo* and *Hawaii* foreclose a searching judicial inquiry into legislative or executive motivations even when the political branches have drawn express distinctions that would trigger close scrutiny outside of the immigration context.  It would be strange if courts were nonetheless required to probe deeply into legislative motives—"a substantial intrusion into the workings of" a coequal branch—when an immigration law that draws no such distinction on its face is alleged to discriminate based on race or national origin.  *Arlington Heights*, 429 U.S. at 268 n.18.  Applying rational-basis review to challenges such as Muria-Palacios's avoids that odd result and is faithful to the purpose and text of the statute itself.

2.   Muria-Palacios's Challenge Fails Under Rational-Basis Review.

The federal illegal reentry statute is constitutional under the rational-basis standard, because the relevant question is whether the challenged provision "bears some rational relation to a legitimate government interest or purpose."  *Ruiz-Chairez*, 493 F.3d at 1092.

In *Ruiz-Chairez*, the Ninth Circuit recognized that "deterring illegal reentry" is precisely such an interest.  *Id.*; *see also Hudson v. United States*, 522 U.S. 93, 105 (1997) (calling deterrence "a traditional goal of criminal punishment"); *Ayala-Bello*, 995 F.3d at 715 ("[T]he federal government has a legitimate interest in controlling our borders.").  And § 1326 is rationally designed to advance that interest, because "its clear purpose is to deter aliens who have been forced to leave the United States from reentering the

United States." *Hernandez-Guerrero*, 147 F.3d at 1078 (ellipses and quotation marks omitted); *see* S. Rep. No. 70-1456, at 1-2 (1929). Indeed, "without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078.

For that reason, all district courts to apply rational-basis review in constitutional challenges to § 1326 have upheld the statute as constitutional. *See, e.g.*, *United States v. Rivera-Sereno*, No. 2:21-CR-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *United States v. Amador-Bonilla*, No. CR-21-187-C, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229 (D.N.M. Aug. 12, 2021); *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D.V.I. June 16, 2021); *United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); *see also United States v. Ruiz-Rivera*, No. 3:20-MJ-20306-AHG, 2020 WL 5230519, at *4–5 (S.D. Cal. Sept. 2, 2020) (applying rational-basis review to hold 8 U.S.C. § 1325 constitutional). The Court should do the same here.

**B.   Muria-Palacios's Reliance on *Arlington Heights* Is Misplaced.**

Muria-Palacios argues that § 1326 violates equal protection principles due to its predecessor statute's allegedly checkered past. ECF No. 33 at 6–20. This position hinges almost exclusively on *Arlington Heights*, Muria-Palacios's reliance on that case and its progeny is misplaced for a number of reasons. First, *Arlington Heights* requires an inquiry into congressional motives that the jurisprudence surrounding Congress's plenary powers over immigration plainly forbids. Second, Muria-Palacios's challenge is directed entirely at the motives of a handful of legislators who passed a statute more than twenty years prior to the passage of § 1326—motives that have no bearing on the passage of the law he actually challenges. Third, the evidence cited by Muria-Palacios for the disparate impact that § 1326 supposedly has on certain racial groups is readily explained by other factors.

1.   *Arlington Heights* Allows a Searching Inquiry Into Legislative Motives Only in Certain Circumstances.

Constitutional challenges based on disparate impact alone are not cognizable under the Equal Protection Clause. Instead, "[p]roof of racially discriminatory intent or purpose is required to show a

violation of" that Clause. *Arlington Heights*, 429 U.S. at 265; *see Washington v. Davis*, 426 U.S. 229, 239–42 (1976).

When the law alleged to discriminate against individuals of a particular race or national origin is neutral on its face, courts evaluate the existence of such intent using the *Arlington Heights* framework, under which a legislature alleged to have acted with discriminatory intent is not automatically saddled with the sins of its predecessors. *See City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality opinion) ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful."). In conducting the intent inquiry, courts generally presume that the legislature acted in good faith and require a movant to present evidence that the challenged law—not just a prior version of that law—was motivated in part by a discriminatory purpose. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324–25 (2018); *see also City of Mobile*, 446 U.S. at 74 (discriminatory intent must be "proved in a given case"). A challenger must show "that the decisionmaker, in this case [the] legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). That standard requires more than proof that the legislature had "awareness of [the] consequences" for the affected group, that those consequences were "foreseeable," *id.* at 278-79, or that it acted "with indifference to" the effect on that group, *Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020). While such evidence may include proof that earlier legislatures had discriminatory intent when enacting particular laws, the probative value of such evidence decreases the more remote in time it is. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020) (plurality opinion); *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987). The probative value of evidence of discriminatory intent is also reduced where it is attributable to a legislature with "a substantially different composition." *Brnovich v. DNC*, 141 S. Ct. 2321, 2349 n.22 (2021) (quotation marks omitted). Finally, a statute found to be enacted due to discriminatory intent under the foregoing analysis is still constitutional if the government shows that it would have been enacted "in absence of the . . . discriminatory motivation." *Hunter v. Underwood*, 471 U.S. 222, 225 (1985).

///

///

2.      The Searching *Arlington Heights* Analysis Does Not Apply to Federal Immigration Laws.

Muria-Palacios needs the Court to apply *Arlington Heights* in order for his argument to be persuasive.  But the searching review of a given statute's background, and of the motivations of those who supported it, called for by *Arlington Heights* does not apply in the federal immigration context because of Congress's plenary power in that arena.

The expansive *Arlington Heights* inquiry is antithetical to the longstanding principle that, with regard to congressional immigration policy, it is "not the judicial role . . . to probe and test the justifications for the legislative decision."  *Fiallo*, 430 U.S. at 799.  The ultra-exacting inquiry called for by *Arlington Heights* cannot be squared with the plenary power given to Congress over immigration policy and the narrow judicial review over such policymaking.  *See United States v. O'Brien*, 391 U.S. 367, 384 (1968) ("We decline to void essentially on the ground that it is unwise legislation which Congress had the undoubted power to enact and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it."); *City of Las Vegas v. Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) ("The Supreme Court has held that an otherwise constitutional statute will not be invalidated on the basis of an 'alleged illicit legislative motive,' and has refused to inquire into legislative motives." (citing *O'Brien*)); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 n.29 (9th Cir. 2005) ("The Supreme Court has held unequivocally that it 'will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.'" (citing *O'Brien*)).

*O'Brien* and the cases applying it simply prohibit the inquiry that Muria-Palacios's motion requires the Court to make in order to invalidate the illegal re-entry statute.  Indeed, and perhaps because of this, there is only a single case the government is aware of invalidating § 1326 under the *Arlington Heights* framework, and that case is presently on appeal to the Ninth Circuit.  *United States v. Carrillo-Lopez*, No. 3:20-CR-00026-MMD-WGC, 2021 WL 3667330, at *2 (D. Nev. Aug. 18, 2021), *appeal filed*, No. 21-10233 (9th Cir. Nov. 19, 2021).

3.      Motives of Legislators From the 1920s Are Irrelevant to the Current Statute.

Moreover, Muria-Palacios cannot escape the reality that the "governing statutory framework" of the United States' immigration law comes from 1952, when Congress replaced prior disparate statutes

with the comprehensive INA.  *See* Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163 (1952); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 756 (9th Cir. 2018) (tracing history of "governing statutory framework"); *City & Cty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 795 (9th Cir. 2019) ("Congress substantially revised the immigration laws in the Immigration and Nationality Act of 1952.").  Hence, Muria-Palacios's evidence of the discriminatory intent that supposedly drove Congress to enact the 1929 immigration law is diminished by the fact that the operative § 1326 was not actually passed until more than two decades—and ten Congresses—later. *Regents*, 140 S. Ct. at 1916; *McCleskey*, 481 U.S. at 298 n.20; *Brnovich*, 141 S. Ct. at 2349 n.22 (noting that the probative value of evidence of discriminatory intent is also reduced where it is attributable to a legislature with "a substantially different composition").

Nor does Muria-Palacios address the fact that a subsequent congressional enactment redefined immigration law through an express anti-discriminatory lens.  *See* Act of Oct. 3, 1965, Pub. L. No. 89-236, 79 Stat. 911; Gabriel J. Chin, *The Civil Rights Revolution Comes to Immigration Law:  A New Look at the Immigration and Nationality Act of 1965*, 75 N.C. L. Rev. 273, 275 (1996) ("The revolutionary feature of the 1965 Act was its elimination of race and national origin as selection criteria for new Americans.").  And he cannot escape the fact that § 1326 has been updated or modified—each time strengthened to provide additional deterrence—multiple times by Congress, including in 1988, 1990, 1994, 1996, and 1997.  *See supra* Part II.C.  Perhaps for this very reason, Muria-Palacios does not argue that the Congress which enacted the current version of § 1326 did so with discriminatory intent.  *See* ECF No. 33 at 18 (noting that the Undesirable Aliens Act of 1929 has been reenacted several times but asserting that because "courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint"), 20 (summarizing argument as showing "that racism and eugenics were, at minimum, a 'motivating factor' in the passage of the Undesirable Aliens Act" of 1929).  This is fatal to Muria-Palacios's argument because, for his motion to make sense under the *Arlington Heights* framework, the presently operative version of § 1326 must be imputed with the same racist motivations he ascribes to the original version of the statute passed in the 1920s.  *Bolden*, 446 U.S. at 74 ("[P]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful.").

### 4.   Muria-Palacios's Motion Fatally Mischaracterizes Supreme Court Precedent.

Muria-Palacios's attempt to invalidate § 1326 by linking it to a national legislature that passed a different statute also fails because he misreads recent Supreme Court precedent interpreting *Arlington Heights*, specifically, *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020).  *See generally* ECF No. 33 at 20 (arguing that *Ramos* and *Espinoza* "confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its constitutionality").

In *Ramos*, the Supreme Court held that the Sixth Amendment requires that a jury find a criminal defendant guilty by a unanimous verdict.  That result flowed simply from a historical and textual analysis of the Sixth Amendment.  Based on that analysis, the Supreme Court concluded that at common law a "trial by an impartial jury" "unmistakabl[y]" required a jury to "reach a unanimous verdict in order to convict."  *Ramos*, 140 S. Ct. at 1395.  The Supreme Court did not hold that the origins of the state laws at issue were the basis for invalidating them.  On the contrary, the majority, even while commenting on the statutes' racist origins, explicitly stated that "the dissent is right about one thing—a jurisdiction adopting a nonunanimous jury rule even for benign reasons would still violate the Sixth Amendment."  *Id.* at 1401 n.44; *see id.* at 1426 (Alito, J., dissenting) ("If Louisiana and Oregon originally adopted their laws allowing non-unanimous verdicts for these reasons, that is deplorable, but what does that have to do with the broad constitutional question before us?  The answer is: nothing.").  Hence, Muria-Palacios's characterization of *Ramos*—suggesting the Supreme Court's discussion of the racial underpinnings of the state law at issue in that case drove its outcome—is simply mistaken.[2]

Likewise, *Espinoza* does not carry the water that Muria-Palacios wants—and needs—it to carry.  There, the Supreme Court considered whether application of a "no aid" provision in Montana's constitution to bar religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment.  *Espinoza*, 140 S. Ct. at 2254.  The Supreme Court found that it did, because the provision "plainly exclude[d] schools from government aid solely because of

---

[2] And in any event, *Ramos* is inapplicable to this case because it does not involve immigration law and its associated deferential standard of review.  *See Ledezma-Cosino*, 857 F.3d at 1049 ("[W]e have consistently held . . . that ordinary rational basis review is the appropriate standard in the immigration context.").

religious status." *Id.* at 2255.  The provision was not found unconstitutional because of any "checkered tradition," as Muria-Palacios suggests.  ECF No. 33 at 20.  That phrase appears briefly in the Supreme Court's opinion in response to the argument that a tradition arose in the second half of the nineteenth century against state support for religious schools.  *Espinoza*, 140 S. Ct. at 2258.  The Supreme Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause.  *Id.* at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause.").

In sum, neither *Ramos* nor *Espinoza* stand for the proposition Muria-Palacios claims—that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint."  ECF No. 33 at 21.  Under close examination, it is clear that Muria-Palacios's motion cites no legal authority that actually supports his argument's central proposition.

> ### 5.   Section 1326 Is Constitutional Because Congress Would Have Enacted It Absent Any Supposed Discriminatory Intent.

Even if the current version of § 1326 was enacted due to racist motivations—which it was not— the statute would still be constitutional if the Court finds that it would have been enacted absent whatever discriminatory purpose might be alleged by Muria-Palacios.  *See Hunter*, 471 U.S. at 225, 228; *Arlington Heights*, 429 U.S. at 270 n.21.

Section 1326 would have been enacted absent discriminatory intent because "control[ling] unlawful immigration … is a normal regulatory function of the sovereign."  *Rizo-Rizo*, 2021 WL 5024364, at *4.  And imposing a sanction on those who repeatedly violate the country's immigration laws (and territorial boundaries) is a basic feature of a controlled border.  That is why the Ninth Circuit characterizes § 1326 as "a *necessary piece* of the immigration-regulation framework," without which "Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078.  It is also why many other countries criminalize unlawful entry and reentry in some form.  *See* Law Library, Library of Congress, *Criminalization of Illegal Entry Around the World* 3 (2019), https://tile.loc.gov/storage-services/service/ll/llglrd/2019685473/ 2019685473.pdf (noting existence of "162 countries that have laws criminalizing or otherwise punishing

illegal entry," of "124 countries that treat illegal entry as a crime," and that "criminal sanctions may apply if aggravating circumstances are present" in countries that treat illegal entry as a civil matter); *see also Hayden v. Paterson*, 594 F.3d 150, 167–68 (2d Cir. 2010) (concluding that widespread adoption of felon-disenfranchisement laws across states and over time confirmed "the obvious, noninvidious purpose" of such laws).

More fundamentally, the repeated amendments to § 1326 since 1952 obviate any need to speculate about whether Congress would have enacted the statute absent discriminatory motives because Congress has actually done so.  Congress has revisited § 1326 five times—in 1988, 1990, 1994, and twice in 1996—to increase the statute's financial and carceral penalties, broaden its scope, and establish criteria for raising a common defense to prosecution.  *See supra* Part II.C.  Muria-Palacios does not allege that these amendments were motivated by discriminatory intent.  And the fact that Congress has repeatedly expanded § 1326's scope and penalties without any evidence of discriminatory intent indicates that the law would have passed in the first instance absent any impermissible motive.

The Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, is particularly illustrative of Congress's efforts to increase § 1326's deterrent value in legislation that lacks any hint of racial animus.  The 1990 Act authorized greater fines for § 1326 violations.  *Id.* § 543, 104 Stat. at 5059.  Yet in the same Act, Congress more than doubled the then-existing cap on immigration, granted Temporary Protected Status to citizens of El Salvador fleeing that country's civil war, and created a diversity visa program to increase the number of visas provided to countries that were underrepresented in admission to the United States.  *Id.* §§ 131, 303, 104 Stat. at 4997–99, 5036–37.  That § 1326 was amended as part of legislation that marks "an about face away from the racist trope that accompanied" earlier immigration laws confirms that Congress viewed the statute as an important deterrence measure separate and apart from any discriminatory motive.  *United States v. Gallegos-Aparicio*, No. 19-cr-2637, 2020 WL 7318124, at *3 (S.D. Cal. Dec. 11, 2020).

The Court should deny Muria-Palacios's motion because there are substantial indications that Congress would have enacted it regardless of any purportedly discriminatory animus he may see.

///

///

**C.**   **Section 1326's Impact on Certain Defendants Does Not Give Rise to an Inference of Discriminatory Intent.**

Muria-Palacios argues that § 1326 is unconstitutional because of its disparate impact on Hispanic defendants.  ECF No. 33 at 22–24.  This argument is flawed because it fails to account for two obvious alternative explanations for the high number of Hispanic defendants charged with violating the statute.  First, the United States shares a nearly 2,000-mile border with Mexico.  *See Hernandez*, 140 S. Ct. at 746.  Second, Hispanic individuals make up a disproportionately high percentage of those illegally in the United States, and thus an outsized share of those eligible for prosecution under § 1326.

Recent decisions of the Supreme Court and the Ninth Circuit undercut Muria-Palacios's reasoning on this point.  In *Regents*, for example, beneficiaries of the deferred-action immigration program argued that the disparate impact of the program's rescission "on Latinos from Mexico, who represent 78% of" the program's beneficiaries, supported an inference that the recission was driven by an invidious discriminatory purpose.  140 S. Ct. at 1915.  Eight Justices rejected that argument.  *Id.* at 1915–16 (plurality opinion); *id.* at 1919 n.1 (Thomas, J., concurring in part and dissenting in part); *id.* at 1936 (Kavanaugh, J., concurring in part and dissenting in part).  The Court's lead opinion explained that the disparity did not, "either singly or in concert" with other factors, make out a "plausible equal protection claim."  *Id.* at 1915.  The plurality reasoned that, "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration program."  *Id.*  And "[w]ere this fact sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds."  *Id.* at 1916.

The Ninth Circuit later reached a similar conclusion in *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020).  In that case, the movants challenged on equal-protection grounds the Executive Branch's decision to terminate four countries—Sudan, Nicaragua, Haiti, and El Salvador—from the temporary-protected-status (TPS) program, which affords relief to noncitizens who cannot safely return to their home nation for certain reasons.  *Id.* at 879, 883.  In rejecting that challenge, the Ninth Circuit afforded no weight to the asserted disproportionate impact that the program's termination had on individuals from countries with "predominantly 'non-white' populations."  *Id.* at 898.  The Ninth Circuit explained that,

1   while the four countries at issue in the case were "'non-European' with predominantly 'non-white'

2   populations, the same [was] true for" most other countries involved in the TPS program since 1990.  *Id.*

3   ("[V]irtually every country that has been designated for TPS . . . has been 'non-European' . . . and most

4   have majority 'non-white' populations.").  Were a disparity of that nature to suffice, the Ninth Circuit

5   continued, "almost any TPS termination in the history of the program would bear 'more heavily' on

6   'non-white, non-European' populations and thereby give rise to a potential equal protection claim"—

7   which "cannot be the case."  *Id.*

8       *Regents* and *Ramos* reflect the sensible proposition that outsized effects on certain populations

9   are an expected byproduct of broad-based immigration regulations, and do not necessarily give rise to

10  the same inference of discriminatory intent that might exist in other settings.  And that principle applies

11  squarely to Muria-Palacios's challenge to § 1326.  Because a disproportionate share of the individuals

12  excluded or removed from the United States are Mexican or Hispanic, it stands to reason that a high

13  share of those prosecuted for illegally returning after removal will likewise be Hispanic.  That is all the

14  more true considering the proximity of the United States to Mexico and Central America, and the

15  relative ease of returning to the United States from those locations over land.  *See United States v.*

16  *Arenas-Ortiz*, 339 F.3d 1066, 1070 (9th Cir. 2003) (explaining "that it would be substantially more

17  difficult for an alien removed to China to return to the United States than for an alien removed to

18  Mexico to do so"); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 973 (9th Cir. 2021)

19  (recognizing that noncitizens "traveling overland from El Salvador, Honduras, or other countries south

20  of Guatemala" can enter the United States through Mexico).

21      Geography and factors driving migration from Mexico and Central America—not discriminatory

22  intent—explain the percentage of Hispanic defendants in § 1326 prosecutions.

23      **D.   <u>An Evidentiary Hearing Is Not Necessary.</u>**

24      The Court need not hold an evidentiary hearing in order to reject Muria-Palacios's motion.

25  Rational-basis review applies to § 1326 and that statute is plainly constitutional under that rubric.  *See*

26  *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (reasoning that evidentiary hearing not

27  required where materials provided to court "show as a matter of law that [the defendant] was not entitled

28  to relief").

1

## IV.    <u>CONCLUSION.</u>

The Court should deny Muria-Palacios's motion because § 1326 is constitutional.  It is a valid exercise of Congress's authority to regulate immigration, one with a more than rational basis in valid governmental interests.

Dated:  February 18, 2022                                    PHILLIP A. TALBERT
                                                            United States Attorney


                                                    By:   /s/ SAM STEFANKI
                                                          SAM STEFANKI
                                                          Assistant United States Attorney